ORDERED.

Dated:  April 02, 2018

_____
Karen S. Jennemann
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
www.flmb.uscourts.gov

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| WADE MARTIN ROME and KATHLEEN MALONEY ROME, | ) ) ) | Case No. 6:15-bk-02498-KSJ Chapter 7 |
| Debtors. | ) ) ) | |
| | ) ) | |
| UNITED STATES TRUSTEE, | ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) | Adversary No. 6:15-ap-00130-KSJ |
| WADE MARTIN ROME and KATHLEEN MALONEY ROME, | ) ) ) | |
| Defendants. | ) ) ) | |
| | ) | |
| ROBERT THOMAS, et al. | ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) | Adversary No. 6:15-ap-000132-KSJ |
| WADE MARTIN ROME, | ) ) | |
| Defendant. | ) | |

1

|  |  |  |
|---|---|---|
| CARLA P. MUSSELMAN, et al. | ) | |
|  | ) | |
| Plaintiffs, | ) | |
|  | ) | |
| vs. | ) | Adversary No. 6:16-ap-00066-KSJ |
|  | ) | |
| WADE MARTIN ROME and KATHLEEN MALONEY ROME, | ) ) | |
|  | ) | |
| Defendants. | ) | |

## **MEMORANDUM OPINION DENYING DEBTORS' DISCHARGE**

Former business partners[1] and the United States Trustee[2] contend the Debtors should not receive a discharge of their debts under various provisions of the Bankruptcy Code[3] because they hid assets before and during this bankruptcy case, failed to keep or withheld business records preventing the parties from determining the Debtors' true financial condition, cannot explain their loss of assets, and lied on their bankruptcy pleadings. Debtors vehemently deny these allegations arguing failed businesses, a fire, a computer crash, multiple foreclosures, and in Mr. Rome's words, "hookers and blow," caused their financial decline and inability to produce any meaningful financial records. After a multi-day trial,[4] the Court finds that the Debtors are not entitled to a discharge under §§ 727(a)(3), (4), and (5).

---

[1] Robert Thomas, Frederick Laufer, and Brian Kaufman ("Creditors") are former business partners of Wade Rome. They got an Amended Final Judgment against Wade Rome in Florida State Courts for $639,841.20 on April 15, 2014 (*See* Exh. 113), and, after this Chapter 7 bankruptcy case was filed on March 23, 2015, they timely filed Adversary Proceeding 6:15-ap-00132-KSJ. Plaintiffs object to the dischargeability of this Final Judgment under 11 U.S.C. §§ 523(a)(2), (a)(4), and (a)(6) and also object to Mr. Rome's discharge under 11 U.S.C. §§ 727(a)(3), (a)(4), and (a)(5).
[2] The Chapter 7 Trustee, Carla Musselman, timely filed 6:15-ap-00130-KSJ contending that the Debtors are not entitled to a discharge under 11 U.S.C §§ 727(a)(2), (a)(3), (a)(4)(a), (a)(4)(D), and (a)(5). The United States Trustee later was substituted as plaintiff for the Chapter 7 Trustee. Adversary Proceeding 6:15-ap-00132-KSJ and 6:15-ap-00130-KSJ were consolidated for all purposes together with a third adversary proceeding, 6:16-ap-00066-KSJ, discussed later in this opinion. The Court requested briefing and need only rule on the counts asserted under 11 U.S.C § 727. The counts asserted under 11 U.S.C. § 523 are irrelevant because the Debtors are denied a discharge.
[3] All references to the Bankruptcy Code refer to 11 U.S.C. §§ 101 *et. seq.* All Doc. No. citations refer to pleadings filed in Adversary Proceeding 6:15-ap-00132-KSJ unless otherwise noted. Documents cited in the other two adversary proceedings will be cited like this: "Doc. No. ___ in 15-ap-130" or "Doc. No. ___ in 16-ap-66."
[4] Trial was held on February 21-23, 2017, and on June 12-14, 2017.

The primary purpose of a Chapter 7 consumer bankruptcy case is to reward an honest debtor with a fresh start from all debts—a discharge.[5] Courts construe objections to discharge liberally for the debtor and strictly against the objecting party.[6] However, only those debtors who fully disclose their assets may receive a discharge.[7] Early and complete disclosure by the honest debtor avoids extraordinary and unjustified work by Chapter 7 Trustees, who should not spend time recreating what "may" have happened to a debtor's assets.[8]

When a party objects to a debtor's discharge, the initial burden is on that party to prove the objection by a preponderance of the evidence.[9] Once met, the burden shifts to the debtor to rebut the allegations.[10] Plaintiffs here argue the Debtors are precluded from discharging their debts because they failed to produce or to keep adequate financial records to allow their creditors to ascertain their true financial condition (§ 727(a)(3)), they knowingly or fraudulently made a false oath or account (§ 727(a)(4)(A)), and they failed to satisfactorily explain their loss of assets (§ 727(a)(5)).

Section 727(a)(3) provides a debtor should not receive a discharge if he or she fails to maintain adequate books and records from which the debtor's true financial condition can be ascertained.[11] The purpose of § 727(a)(3) is to give creditors, the trustee, and the bankruptcy court, "complete and accurate information regarding the status of a debtor's affairs and to test the

---

[5] *Perez v. Campbell*, 402 U.S. 637, 660, 91 S. Ct. 1704, 1716, 29 L. Ed. 2d 233 (1971).
[6] *Coady v. D.A.N. Joint Venture III, L.P. (In re Coady)*, 588 F.3d 1312, 1315 (11th Cir. 2009); *Reynolds v. Trafford (In re Trafford)*, 377 B.R. 387, 392 (Bankr. M.D. Fla. 2007).
[7] *In re Coady*, 588 F.3d at 1315 (citing *Jennings v. Maxfield (In re Jennings)*, 533 F.3d 1333, 1338-39 (11th Cir. 2008)).
[8] *Waldron v. Brown (In re Waldron)*, 536 F.3d 1239, 1244 (11th Cir. 2008).
[9] Fed. R. Bankr. P. 4005; *Grogan v. Garner*, 498 U.S. 279, 287, 111 S. Ct. 654, 659-60, 112 L. Ed. 2d 755 (1991).
[10] *Id.*
[11] Section 727(a)(3) of the Bankruptcy Code provides:
    (a) The court shall grant the debtor a discharge, unless--. . .
    (3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case.

3

completeness of the [debtor's] disclosure."[12] Giving truthful and complete financial books and records to the Chapter 7 Trustee is mandatory. Every trustee needs the information to administer the bankruptcy case, and this is a condition precedent to receiving a discharge.[13] Courts have wide discretion in determining whether a debtor has maintained sufficient records.[14]

Courts generally must decide whether the books and records produced by a debtor "are adequate to permit the court and creditors to trace the debtor's financial dealings."[15] "While perfect record keeping is not required, the creditors examining the debtor's records 'must be reasonably able to follow the debtor's business transactions, make intelligent inquiry, verify the oral statements and explanations of the bankrupt, and ascertain the present and past financial condition of the bankrupt [with] substantial completeness and accuracy.'"[16]

Section 727(a)(4)(A) provides that a debtor shall not receive a discharge where he "knowingly and fraudulently, in or in connection with the case, makes a false oath."[17] The false oath must be both fraudulent and material.[18] A false oath is material if it "bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence or disposition of his property."[19] An omission from a debtor's schedules or statement of financial affairs, for example, can constitute a false oath under § 727(a)(4).[20] After a plaintiff's initial burden is met, the burden shifts to the debtor to prove he did not knowingly and fraudulently make a material false oath.[21]

---

[12] *Sackett v. Shahid (In re Shahid)*, 334 B.R. 698, 706 (Bankr. N.D. Fla. 2005) (citing *Grant v. Sadler (In re Sadler)*, 282 B.R. 254, 263 (Bankr. M.D. Fla. 2002)).
[13] *In re Shahid*, 334 B.R. at 706-07 (internal citations omitted).
[14] *Id.* at 707 (internal citations omitted).
[15] *Id.*
[16] *Id.*
[17] 11 U.S.C. § 727(a)(4)(A).
[18] *Swicegood v. Ginn,* 924 F.2d 230, 232 (11th Cir. 1991).
[19] *Chalik v. Moorefield (In re Chalik)*, 748 F.2d 616, 619 (11th Cir. 1984).
[20] *In re Whitehill*, 514 B.R. 687, 692 (Bankr. M.D. Fla. 2014).
[21] *Pellegrino, et al. v. Metro Unlimited and Dakhllahlah (In re Dakhllalah)*, Adversary No. 6:09-ap-739–KSJ, 2010 WL 148457 at *3 (Bankr. M.D. Fla. Jan. 7, 2010).

Section 727(a)(5)[22] precludes a debtor's discharge where the debtor fails to explain a loss of assets.[23] A plaintiff has the preliminary burden of demonstrating that the debtor "formerly owned substantial, identifiable assets that are now unavailable to distribute to creditors."[24] Upon such a showing, debtors then must supply a satisfactory reason why they no longer have the asset.[25] "A [debtor's] general oral explanation for the disappearance of substantial assets without documentary corroboration" is not enough.[26] Vague and indefinite explanations of losses are not sufficient.[27]

Applying these legal standards to the facts, Plaintiffs assert that Debtors had (and may still have) substantial assets but have failed to disclose or to sufficiently account for the loss of these assets. Although they provided thousands of pages of records, none satisfactorily explain where these assets went. And, the Debtors' other explanations of their financial losses are not credible.

Plaintiffs have proven overwhelmingly that Debtors had (and may still have) substantial assets. Pre-bankruptcy, the Debtors lived lavishly. They owned several homes and other real estate.[28] Mr. Rome was the CEO and President of Apex Radiology, Inc. ("Apex"), a multimillion dollar company that hired doctors to provide radiology services to hospitals and other doctors.[29] According to the Debtors' Memorandum of Law, Mr. Rome's "income was commensurate with

---

[22] Section 727(a)(5) provides:
   (a) The court shall grant the debtor a discharge, unless-- . . .
       (5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities.
[23] *Hawley v. Cement Indus. (In re Hawley)*, 51 F.3d 246, 249 (11th Cir. 1995).
[24] *Turner v. Tran (In re Tran)*, 297 B.R. 817, 836 (Bankr. N.D. Fla. 2003) (citing *First Commercial Fin. Group v. Hermanson (In re Hermanson)*, 273 B.R. 538, 545 (Bankr. N.D. Ill. 2002) (citing *Banner Oil Co. v. Bryson (In re Bryson)*, 187 B.R. 939, 955 (Bankr. N.D. Ill. 1995))).
[25] *Id.*
[26] *In re Tran*, 297 B.R. at 836 (citing *In re Hermanson*, 273 B.R. at 549).
[27] *In re Chalik*, 748 F.2d at 616.
[28] Doc. No. 194, p. 4.
[29] 2-21-17 Testimony of W. Rome 34:2-12.

5

that of a CEO at that level, and the Rome family lived accordingly."[30] Debtors also owned and operated a martial arts gym,[31] a restaurant,[32] car dealerships,[33] and a payday loan company.[34] Both Debtors actively worked in these joint business ventures.[35]

Debtors also have an established practice of trading items for barter and cash without maintaining normal financial records. They sold substantial valuable personal property at informal auctions and sales. Mr. Rome traded precious metals including gold and silver, keeping few or no records.[36] Mrs. Rome sold bootleg women's purses.[37] And, importantly for this case, Debtors for years have failed or refused to keep normal financial records to document their business dealings. The Court concludes that the examples discussed below and identified during the trial of the Debtors' unorthodox business dealings likely are just the "tip of the iceberg" of the numerous business transactions that went undetected by the Chapter 7 Trustee or the Creditors.

On March 23, 2015, the Debtors filed this joint Chapter 7 bankruptcy case.[38] Debtors listed no cash, and only $290 in the Debtors' joint bank account.[39] They disclosed $43,588.65 in personal property, claiming virtually all property as exempt from creditor claims.[40] Except for consulting income of $10,800 earned in 2014, Debtors' Statement of Financial Affairs ("SOFA") indicated

---

[30] Doc. No. 194, p. 4.
[31] 2-21-17 Testimony of W. Rome 35:14-17, 41:22-25, 42:1-4.
[32] 2-21-17 Testimony of W. Rome 35:9-13.
[33] Exh. 116.
[34] 2-21-17 Testimony of W. Rome 35:19-23.
[35] Exh. 100; 6-13-17 Testimony of Kessler 31:11-15, 36:17-20, 40:24-25, 45:9-24, 54-56, 59:9-14, 60:11-18; *see also* 2-22-17 Testimony of K. Rome 72:3-8.
[36] 2-21-17 Testimony of W. Rome 200.
[37] Exh. 105; 6-13-17 Testimony of Kessler 46:13-25, 48:1-12; *see also* 2-22-17 Testimony of K. Rome 54-56.
[38] Doc. No. No. 1 in Case No. 6:15-bk-02498-KSJ.
[39] Exh. 125.
[40] Wade Rome claimed $19,222.65 of this personal property was exempt from creditor claims. Kathleen Rome claimed $15,597.50 as exempt from creditor claims. Of the disclosed personal property valued at $43,588.65, they Debtors collectively claimed $34,820.15 as exempt, leaving $8,768.50 available for administration by the Chapter 7 Trustee.

no earned income for 2013,[41] 2014,[42] and pre-petition 2015.[43] Yet, they listed unsecured debts of almost $4.8 million.

If the Debtors' schedules are to be believed, they quickly went from living a privileged lifestyle to one of poverty. The Court however concludes that the Debtors schedules are mostly fiction and do not reflect the Debtors' true financial situation. The Court relies on a few examples to buttress this conclusion that the Debtors had substantial assets, have failed to explain what happened to these assets, and have lied on their bankruptcy schedules.

### Debtors Received $1.4 Million in October 2012

In 2007, Apex sold its assets to Franklin & Seidelmann, LLC ("F&S")[44] for an upfront payment of $4.1 million and a promissory note of $3.5 million.[45] Mr. Rome received about $1.4 from the initial payment.[46] F&S also hired Mr. Rome under the terms of the sale.[47] The employment relationship was rocky and ended with Mr. Rome's termination.[48]

Both Debtors sued F&S individually for damages resulting from Mr. Rome's employment termination.[49] Mrs. Rome claimed physical injuries resulted from her husband's termination.[50] Mr. Rome claimed a more straight-forward breach of contract claim.[51] In October 2012, Debtors won and received an arbitration award of $1.4 million from F&S.[52]

---

[41] Exh. 125; Exh. 1.
[42] Exh. 125; Exh. 1; *see also* 2-21-17 Testimony of W. Rome 150:5-10.
[43] Exh. 125; Exh. 1.
[44] Exh. 36; Exh. 53; 2-21-17 Testimony of W. Rome 33:13-16.
[45] Exh. 36; Exh. 53; 2-21-17 Testimony of W. Rome 56:15-25, 57:1-4, 59:17-26, 60:1-9.
[46] Exh. 36; Exh. 53; 2-21-17 Testimony of W. Rome 62:8-17. Debtors have failed to account for the $1.4 million they earlier received in 2007.
[47] Exh. 36; Exh. 53; 2-21-17 Testimony of W. Rome 57:19-25, 58:1-10.
[48] 2-21-17 Testimony of W. Rome 33:13-16, 59:9-13.
[49] Exh. 107; Exh. 108; 2-21-17 Testimony of W. Rome 108:7-25.
[50] *Id.*
[51] *Id.*
[52] Exh. 107; *see also* 2-21-17 Testimony of W. Rome 92-100; 2-22-17 Testimony of K. Rome 67:1-17.

Debtors do not satisfactorily explain where these substantial monies of $1.4 million went between receipt in October 2012 and the bankruptcy filing in March 2015, a period of only 18 months.[53] Debtors also fail to account for the earlier monies received in 2007 (an additional $1.4 million) and in 2009 (over $1 million). Debtors received approximately $3.8 million between 2007 and their bankruptcy filing in March 2015. Yet, they claim few assets and provide no credible explanations for what happened to the money.

### **Debtors Obfuscated Ownership of Their Vehicles and Hid Personal Property**

Debtors drove and had exclusive use of two cars, a Honda Odyssey and a Nissan Titan, when they filed bankruptcy.[54] They did not list these cars in their schedules contending they had no ownership interest. The Court finds this testimony false and unbelievable under § 727(a)(4)(A).

In August 2010, Mr. Rome obtained the Honda Odyssey and titled it jointly to Wade Rome and B&H Auto.[55] The B&H Auto entity, however, did not exist when the title was issued.[56] Similarly, in 2012, Mr. Rome acquired[57] the Nissan Titan with a check drawn from Macon Finance,[58] and titled it in Rome Enterprise's name, a business he controlled.[59]

---

[53] In 2009, the Apex shareholders, including the Plaintiff Creditors, went to a separate arbitration over F&S's failure to pay the balance of the promissory note due to purchase the company. Exh. 25; Exh. 107; 2-21-17 Testimony of W. Rome 82-83. Apex won and was awarded approximately $1.7 million. Exh. 107; Doc. No. 5, p. 4, no. 48 (Debtors admitted the arbitration resulted in an award of $1,696,330.34); *see also* 6-12-17 Testimony of Kaufman 113:18-25, 114:19; 2-21-217 Testimony of W. Rome 82:11-20. Mr. Rome kept most of this award and distributed the balance to Apex shareholders. Exh. 27; Exh. 92; 6-12-17 Testimony of Kaufman 113:18-25, 114:19; 2-23-17 Testimony of Laufer 115:17, 112:23; 2-21-17 Testimony of W. Rome 85:23-25, 86:1-6. Plaintiff Creditors assert this retention was improper and led to their lengthy litigation in state court. Debtors offered no credible testimony on what happened to this substantial additional money of over $1 million received in 2009.

[54] Doc. No. 194, p. 10, n. 27; 2-21-17 Testimony of W. Rome 147:18-25, 148:1.

[55] Exh. 102; 2-21-17 Testimony of W. Rome 152:1-7, 157:18-25.

[56] Exh. 116.

[57] Exh. 117.

[58] Exh. 17; 2-21-17 Testimony of W. Rome 154-160, 176-117.

[59] Exh. 60; 6-12-17 Testimony of B. Rome 158:19-25; 2-21-17 Testimony of W. Rome 182.

Debtors drove both cars for years under expired dealer's licenses and fake stickers.[60] Debtors insured both cars telling their insurance company, GEICO, they were the owners of the two cars.[61] Debtors had exclusive control of the Odyssey and the Titan from the day they got the vehicles until they turned the cars over to the Chapter 7 Trustee.[62] Debtors were the true legal owners of the cars, regardless of the "name games" played with the car titles.[63]

Debtors also had numerous motorcycles they never disclosed in their schedules. Terry Brown, the Debtors' neighbor, regularly observed motorcycles at the Debtors' home in Florida in early 2015.[64] Mr. Brown testified he saw the Debtors moving these motorcycles with substantial other personal property from their Florida home shortly before this bankruptcy was filed.[65] Sandra Trudeau, the Debtors' landlord, testified Mr. Rome told her he owned ten motorcycles and that he often drove to her home on a motorcycle.[66] Ms. Keela Ratliff, a former employee of one of the Debtors' many businesses, stated that she observed three to four motorcycles at the Debtors' prior home in Missouri.[67]

On August 12, 2015, the Trustee inspected the Debtors' residence in Florida.[68] She discovered a large Liberty Lincoln safe at least five feet in high and two feet in width not disclosed

---

[60] Exh. 102; 2-21-17 Testimony of W. Rome 154-160, 165-166, 174:11-13; 6-12-17 Testimony of B. Rome 158:19-25.
[61] Exh. 118; 6-12-17 Testimony of Cockrell (GEICO) 25:1-9, 32:23-25, 33:1, 33:12-16, 36:15-20, 37:20-22, 41:13-21, 42:3-9, 55:1-9; 2-21-17 Testimony of W. Rome 158:2-10, 2-21-17, 177:11-22.
[62] Exh. 116; Exh. 122; Exh. 132; 2-22-17 Testimony of Musselman 48:24-25, 49:1-2, 184:3-10, 197:23-25, 198:1-4, 203:4-14; *see also* 2-21-17 Testimony of W. Rome 153-156; 2-22-17 Testimony of K. Rome 62:15-24, 64:9-18.
[63] 2-22-17 Testimony of Musselman 48:24-25, 49:1-2, 184:3-10, 197:23-25, 198:1-4, 203:4-14; 6-12-17 Testimony of Cockrell (GEICO) 25:1-9, 32:23-25, 33:1, 33:12-16, 36:15-20, 37:20-22, 41:13-21, 42:3-9, 55:1-9; 2-21-17 Testimony of W. Rome 17, 21, 42-43, 140, 145-148.
[64] 6-12-17 Testimony of Brown 67:3-11, 67:14-21, 71:15-17, 71:25, 72:1-3, 76:20-21.
[65] 6-12-17 Testimony of Brown 71:15-17, 71:25, 72:1-3, 76:20-21. Mr. Brown testified that the Debtors moved a full semi truck full of furniture into their Florida home. Little of this furniture remained in the house when the Trustee visited the house on August 12, 2015.
[66] 6-14-17 Testimony of Trudeau 81:4-22, 121:12-16.
[67] Exh. 132, p. 9; Doc. No. 139.
[68] 2-22-17 Testimony of Musselman 172:10-15.

in the Debtors' schedules.[69] Debtors refused to open the safe during the inspection, claiming it belonged to their son.[70] Who knows what was in this safe or what happened to the property moved shortly before the bankruptcy was filed. The breadth and number of vehicles and other personal property the Debtors own and hid is unquantifiable.

## Debtors Purchased $700,000 of Gold, Silver, and Coins in 2012 and 2013

In late 2012 and 2013, Mr. Rome bought $600,000 in gold and silver coins from the Tulving Company.[71] Debtors have not satisfactorily explained what happened to these coins, instead offering two unbelievable stories.[72] First, Mr. Rome contends he tried to exchange some coins but Tulving never sent him the substitute coins.[73] Second, Mr. Rome contends the Tulving Company fraudulently sold him seven sealed boxes, called "monster boxes," that contained "lead shot" and fake Krugerands instead of the valuable metals he ordered.[74]

Mr. Rome testified he did not find the false product because he did not want to break the seal on the monster box.[75] He never filed a police report regarding the alleged "lead shot."[76] And, he never filed a claim in the Chapter 11 case later filed by the Tulving Company.[77]

The Chapter 7 Trustee investigated whether she had a claim against Tulving and concluded she had no legitimate claim.[78] BRG Financial Services, the expert retained in the Tulving bankruptcy, found Mr. Rome was not a potential creditor.[79] And no other creditor in Tulving's bankruptcy case filed a claim contending Tulving had sent lead instead of the requested gold or

---

[69] Exh. 70; Exh. 102; Exh. 125; 2-22-17 Testimony of Musselman 172:10-15. Debtors assert they DID disclose another safe allegedly owned by one of their sons. Exh. 125.
[70] 2-22-17 Testimony of Musselman 178:1-12, 194:7-11.
[71] Exh. 50; Exh. 20; Exh. 108; Exh. 119; 2-21-17 Testimony of W. Rome 110:2-25.
[72] *See* Exh. 84.
[73] 2-21-17 Testimony of W. Rome 123, 144:20-25.
[74] 2-21-17 Testimony of W. Rome 118-123.
[75] *Id.*
[76] *See* Exh. 40; 2-21-17 Testimony of W. Rome 124:11-25.
[77] *Id.*
[78] Exh. 132; 2-22-17 Testimony of Musselman 173:14-19; 2-23-17 Testimony of Musselman 41:6-8, 60:12-16.
[79] *Id.*

silver—not one claim.[80] The Court rejects the Debtors explanation of what happened to the $600,000 of gold and silver purchased in 2012 and 2013. Perhaps the Debtors have used it, perhaps they still have it. But, without doubt, they have not explained what happened to it.

Mr. Rome also bought gold and silver from vendors other than Tulving shortly before filing bankruptcy. Debtors' own witness, Robert Appelman, testified he sold Wade Rome gold for a cash payment of $100,000 in July 2013.[81] Where did this gold purchased for $100,000 go?

And, the Debtors attempted to pay rent in gold and silver to their landlord, Sandra Trudeau, *after* this bankruptcy case was filed, indicating the Debtors still had at least some of the valuable metals. Ms. Trudeau testified that Mr. Rome offered to pay rent in May 2015, about one month after filing bankruptcy, with a coin he valued at $44,000.[82] (The Court notes that, when Ms. Trudeau refused to accept this tendered coin, Debtors gave her $10,134 in cash, when four weeks earlier they claimed to have only $290.)[83] A few days later, Mr. Rome again tried to pay rent with a large bag of silver "so heavy he could not lift it."[84] (As another aside, Mr. Rome also offered to buy the rental home in 2013 and 2014, including a cash offer for $350,000.[85]) How were the Debtors able to pay rent with gold and silver (and cash) after filing bankruptcy, when they listed no gold, silver or coins on their schedules? Debtors offer no credible explanation.

### **Debtors Received Undisclosed Business Income**

Until 2013, Debtors jointly operated a payday loan business, Macon Finance Company ("MPL"), in Macon, Missouri.[86] Debtors did not disclose income arising from MPL, and they failed to produce the company's financial books and records that would allow one to assess the

---

[80] *Id.*
[81] Exh. 73.
[82] 6-14-17 Testimony of Trudeau 91:12-25, 92:1-17.
[83] 6-14-17 Testimony of Trudeau 91:12-25, 92:1-17
[84] 6-14-17 Testimony of Trudeau 92:24-25, 93:1-22, 96:19-25.
[85] 6-14-17 Testimony of Trudeau 67:23-25, 68:1-22.
[86] 6-13-17 Testimony of Kessler 29-30.

business's value. Debtors argue that MPL's financial records remain with MPL's owner and their former attorney, Phil Prewitt.[87] The Court concludes, however, that the Debtors were the true owners and operators of MPL and that they received substantial undisclosed income from the business. This is just another example of the Debtors attempting to evade the consequences of claiming ownership of a business they created and operated.

Mary Kessler, a former employee of MPL,[88] testified that both Debtors were in charge of the business[89] and that she would occasionally make deposits to Rome Enterprises, another one of the Debtors' businesses, without entering the information into MPL's financial books.[90] Ms. Kessler confirmed that Mr. Rome often bought gold and silver coins from customers,[91] but MPL kept no accounting of these purchases unless the gold and silver was exchanged for the payment of a loan.[92] She explained that references to "shareholders" in the company's daily records meant monies sent to Mr. Rome at the direction of Mrs. Rome.[93]

Ms. Kessler also testified that, because the Debtors did not report their earnings to the IRS, she had to prepare a special form to justify her own payroll.[94] Mr. Rome instructed her to stop keeping her own time records demonstrating his established practice of failing to keep routine business records.[95] Obviously, the Debtors' practice of keeping no or incomplete financial records was established long before they filed this bankruptcy case.[96]

---

[87] Doc. No. 194, p. 9.
[88] 6-13-17 Testimony of Kessler 29-30.
[89] 6-13-17 Testimony of Kessler 31:11-15, 36:17-20, 40:24-25, 45:9-24, 54-56; 59:9-14; 60:11-18; *see* 2-22-17 Testimony of K Rome 50-53 (in contrast to Ms. Kessler's testimony, Mrs. Rome testified she never "really worked" at MPL).
[90] 6-13-17 Testimony of Kessler 60:19-23, 61:2-7, 61:24-25, 62:1-4, 76:3-5.
[91] 6-13-17 Testimony of Kessler 49:13-25, 51:2-24; 2-21-17 Testimony of W. Rome 114:6-15.
[92] 6-13-17 Testimony of Kessler 53:7-23.
[93] 6-13-17 Testimony of Kessler 73:10-23.
[94] Exh. 111; 6-13-17 Testimony of Kessler 56:11-25, 57:1-8.
[95] 6-13-17 Testimony of Kessler 34-35, 57:9-12, 63:14-25, 64-65.
[96] 6-13-17 Testimony of Kessler 40:6-15, 45-46, 51:2-24, 63:14-25.

Plaintiffs have established that the Debtors received $1.4 million in October 2012, but reflected only $290 in cash on the day they filed this bankruptcy case. Creditors also established that, on the petition date, Debtors also possessed but failed to disclose two cars, who knows how many motorcycles, precious metals consisting of gold, silver and coins, additional hidden personal property, and income from operating businesses. These are merely examples of substantial, identifiable assets owned by the Debtors at or shortly before filing bankruptcy. I expect no one will locate all property the Debtors owned at the bankruptcy filing, but I conclude their assets were substantially greater than the ones disclosed in their schedules.

### **Debtors Failed to Adequately Explain Loss of Assets**

The burden then shifts to the Debtors to explain satisfactorily what happened to these assets. Debtors have woefully failed this task.

Mr. Rome testified he did not record all of his expenses because he spent a lot of money on "very improper things" including, in his own words, "hookers and blow."[97] Mr. Rome claims he was not in a good place from 2009 to 2014, and he was spending over $5,000 a month on drugs and prostitutes.[98] Debtors state that Mr. Rome was candid about his drug abuse, and that even if the Plaintiffs do not like his explanation, the explanation was "truthful and satisfactory."[99]

The Court rejects the Debtors' explanation on both factual and legal grounds. Factually, the Debtors acknowledge they received $1.4 million in October 2012. If Mr. Rome spent double what he states, $10,000 per month for the 18 months preceding this bankruptcy filing, the spending would only account for $180,000. What happened to the remaining $1.22 million?

---

[97] 2-22-17 Testimony of W. Rome 45-47.
[98] *Id.*
[99] Doc. No. 194, p. 15.

I also legally reject the Debtors' argument that drug use excuses a failure to account for monies and assets. I adopt the strong majority position taken by most courts that drug addiction and alcohol problems do not explain loss of assets. In *In re Dollin*, for example, the Sixth Circuit Court of Appeals found that even if a debtor's drug addiction prevented him from keeping adequate records, the drug addiction did not excuse a failure to account for lost monies.[100] Similarly, in *In re Liberatore*, the Bankruptcy Court for the Eastern District of Pennsylvania found that a debtor's explanation for failing to keep adequate records due to her use of a prescription drug was unsatisfactory when the debtor simultaneously kept other records and handled the requirements of ordinary daily living on her own.[101]

Although Mr. Rome likely spent significant monies on "hookers and blow," he still continued to conduct business. In 2010 and 2012, he finagled a way to get two cars for the family through a sophisticated titling scam that kept the cars' legal title out of the Debtors' names. He successfully managed litigation against F&S resulting in the $1.4 million award in October 2012.[102] He bought gold, silver, and coins for at least $700,000 in late 2012 and 2013.[103] And, he actively managed MPL, the payday loan business in Missouri until its closure in 2013.[104] Mr. Rome wants to convince the Court he was incapacitated by his drug problems before this bankruptcy and use this as an excuse why he cannot account for losing his assets. The evidence does not support this conclusion, and the Court summarily rejects this explanation.

---

[100] *Dolin v. N. Petrochemical Co. (In re Dolin)*, 799 F.2d 251, 253 (6th Cir. 1986).
[101] *DeAngelis v. Liberatore (In re Liberatore)*, 503 B.R. 23, 37 (Bankr. E.D. Pa. 2013); *See also Southeast Bank v. Rowe (In re Rowe)*, 81 B.R. 653, 658 (Bankr. M.D. Fla. 1987) ("The many cases and authorities uniformly hold that a Debtor's explanation that the diminution of his assets were a result of unsubstantiated gambling losses is an unsatisfactory explanation.").
[102] *See* 2-21-17 Testimony of W. Rome 92-100
[103] Exh. 50; Exh. 20; Exh. 108; Exh. 119; 2-21-17 Testimony of W. Rome 110:2-25.
[104] 6-13-17 Testimony of Kessler 34-35, 57:9-12, 63:14-25, 64-65; *see also* 2-21-17 Testimony of W. Rome 35:19-23.

Further, Mrs. Rome, who had no known substance abuse problems, was the primary bookkeeper for the family. She failed to keep adequate records of the couple's financial activities, even though there is evidence she had joint control of bank accounts.[105] Mrs. Rome also was in charge of day-to-day operations of the MPL payday loan business. And, she assisted in preparing the couple's tax returns.[106] She had the financial expertise and access to the Debtors' financial records to keep track of their assets. Debtors, however, deliberately failed to keep traditional financial records.

Debtors argue they lost various financial records due to chaotic events occurring prior to 2012.[107] They claim that many of the missing records and bank statements were lost when Premier Bank failed and when a fire damaged a building where Mr. Rome kept records.[108] The fire, however, occurred in 2010, and Premier Bank failed in 2011.[109] Debtors' loss of income because of Mr. Rome's firing at F&S also occurred in 2008 and 2009.[110] Assuming this is true, what happened to more recent financial records since 2011? Specifically, how did the Debtors spend the $1.4 million they obtained in October 2012?

To answer this question, Debtors point to 4,000 pages of documents they produced. But, after sifting through the evidence and carefully reviewing the testimony, the Court concludes the Debtors only partially explained the loss of some assets. Most documents were submitted to add bulk but little or no content to what happened to the money, the motorcycles, the gold, and the

---

[105] Exhs. 88-98; Exh. 100; *see also* Testimony of K. Rome 34:13-25, 35:1-13, 72:3-8, 152:19-23.
[106] 6-13-17 Testimony of Kessler 31:11-15, 36:17-20, 40:24-25, 45:9-24, 54-56, 59:9-14; 60:11-18; *see also* 2-21-17 Testimony of W. Rome 110:23-26; 111:1-7; 2-22-17 Testimony of K. Rome 80-81.
[107] Doc. No. No. 194, pp. 4-6.
[108] *Id.*; Exh. 77.
[109] *Id.*
[110] 2-21-17 Testimony of W. Rome 33:13-16, 59:9-13; *see also* Exh. 107; Exh. 108.

personal property. Even the Debtors' Memorandum of Law concedes there is an unexplained loss of $624,912.22 in assets.[111]

Mrs. Rome desperately tried to explain the whereabouts of the missing money, the precious metals, and the other assets by testifying about a so-called demonstrative aid titled "Evidence Summary" during the last days of trial.[112] The summary included hard-to-read charts, illegible receipts, and estimated expenses with no apparent methodology or consistent explanation of where the money went.[113] It also included a schedule attached to the Debtors' 2014 tax return that calculated and inferred loss of gold.[114] The Court finds neither this Evidence Summary nor any other excuse offered by the Debtors satisfactorily explains the loss of the Debtors' assets.

The anecdotal testimony of Ms. Trudeau perhaps best captures the Debtors' duplicity. In July 2015, four months after the petition date, Ms. Trudeau asked Mr. Rome whether he had hid assets and he replied, sarcastically while nodding his head yes, but stating "No! No!"[115]

### **Debtors are Not Credible**

Credibility is often the key in determining the sufficiency of a debtor's explanation for lost assets. Here, the Court specifically finds that the both of the Debtors' testimonies were not credible. Mr. Rome particularly could not separate fact from fiction and often gave conflicting testimony.

---

[111] Doc. No. 194, p. 7 (Debtors argue Mr. Oscher's report is not reliable because the Expert concluded that "more than $1.2 million in assets were missing without Explanation, the actual amount of 'unexplained' missing assets is only $624,912.22."); Exh. 108.
[112] *See* Exh. 133; the Court considered but did not admit the "Evidence Summary" as evidence. *See* Doc. No. 183 ("The Court will *only* consider the 'evidence summary' as a demonstrative aid. The Court will not consider the 'evidence summary' in place of the properly admitted evidence or as a formal summary submitted to prove content as permitted by Federal Rule of Evidence 1006."); *see also* 6-13-17 Testimony of K. Rome 173.
[113] Exh. 133.
[114] *Id.*
[115] 6-14-17 Testimony of Trudeau 90:1-12.

Mrs. Rome, sadly, also was not believable. Plaintiffs provided enough evidence to draw a contrary conclusion to the Debtors' numerous representations.[116]

Conversely, the Court finds the third party witnesses, including and especially Ms. Trudeau, credible. Despite the Debtors' allegations that Ms. Trudeau was motivated by "spite and revenge,"[117] Ms. Trudeau supplied believable details. She offered a consistent time line of what occurred between her and the Debtors. Ms. Trudeau was an angry creditor frustrated by the Debtors' financial irresponsibility. But, she was honest in her anger and, although she may have relished the opportunity to "dish dirt" on the Debtors, I conclude she was telling the truth. More important, her testimony was buttressed by other third party testimony including that of Ms. Kessler and Mr. Brown.

## Debtors are Not Entitled to a Discharge

Plaintiffs have shown by a preponderance of the evidence the Debtors are not entitled to a discharge under §§ 727(a) (3), (4)(A), and (5) of the Bankruptcy Code. They failed to explain the loss of their assets, failed to maintain accurate and adequate financial records to allow the parties to evaluate their financial condition, and made false oaths by failing to disclose numerous substantial, identifiable assets. Debtors' explanations for their failures are not credible or accepted.

## Related Adversary Proceeding Seeking an Accounting and Turnover

Plaintiffs also filed a related adversary proceeding seeking turnover of hidden estate property under § 542(a), an accounting of hidden assets, and injunctive relief to prohibit the Debtors from liquidating or transferring the hidden assets.[118] Trustee testified that the "hidden

---

[116] *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 512, 104 S. Ct. 1949, 1966, 80 L. Ed. 2d 502 (1984) ("When the testimony of a witness is not believed, the trier of fact may simply disregard it. Normally the discredited testimony is not considered a sufficient basis for drawing a contrary conclusion.")
[117] Doc. No. 130, p. 5 in 15-ap-130.
[118] Adversary Proceeding 6:16-ap-00066-KSJ.

assets" she was trying to recover were mainly the $600,000 of precious metals purchased from Tulving in October 2012.[119] The evidence admittedly failed to establish what happened to this gold. Requiring an additional accounting at this point from these Debtors is fruitless. And, given that the Debtors will not discharge their debts, further recovery efforts are best left to other forums.

Section 1334(c)(1) governs discretionary abstention and allows a federal court to abstain from hearing a proceeding over which it has jurisdiction.[120] Factors to consider in deciding if a matter should proceed in state court is whether the state court is better equipped to handle the issue.[121] Here, I conclude that the state court is the better forum.

Given the Debtors' deceptive practices, the denial of the Debtors' discharges, and the fact the Plaintiff Creditors litigated this matter in state court for years, this Court will not continue this futile endeavor of attempting to obtain this fungible personal property of gold, silver, and coins. The parties may pursue collection efforts, if they chose, in state court.[122]

A Final Judgment shall be entered denying the Debtors' discharges and abstaining from taking any further action in the related accounting and turnover adversary proceeding.

###

The Clerk is directed to serve a copy of this memorandum opinion on all interested parties.

---

[119] 2-23-17 Testimony of Musselman 38-39.
[120] 28 U.S.C. § 1334(c)(1).
[121] *E.S. Bankest v. United Beverage of Fla. (In re United Container LLC)*, 284 B.R. 162, 176 (Bankr. S.D. Fla. 2002).
[122] 28 U.S.C. § 1334(c)(1) ("except with respect to a case under chapter 15 of title 11, nothing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11.")